THE LAW OFFICE OF ANDREW T. SCHOPPE, PLLC
ANDREW T. SCHOPPE, SBN 8110
419 S. 13th Street
Boise, ID 83702
T: 208.450.3797
F: 208.392.1607
andrew@schoppelaw.com

Attorney for Plaintiffs
MARK EIXENBERGER, MANDI BRAVO,
MARIO VASQUEZ, LEONARD KING,
STEVEN DANFORTH, MORGAN COOMBS, MICHELLE TAYLOR, NATE
HENDERSON, and JOSHUA SWARTZ

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARK EIXENBERGER, an individual; MANDI BRAVO, an individual; MARIO VASQUEZ, an individual; LEONARD KING, an individual; STEVEN DANFORTH, an individual; MORGAN COOMBS, an individual; MICHELLE TAYLOR, an individual; NATE HENDERSON, an individual; JOSHUA SWARTZ, an individual,<br><br>          Plaintiffs,<br><br>   vs.<br><br>CORRECTIONS CORPORATION OF AMERICA, a Maryland Real Estate Investment Trust,<br><br>          Defendants. | CASE NO.:<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

//

//

COMPLAINT
1

**MAY IT PLEASE THE COURT:**

PLAINTIFFS MARK EIXENBERGER, MANDI BRAVO, MARIO VASQUEZ, LEONARD KING, STEVEN DANFORTH, MORGAN COOMBS, MICHELLE TAYLOR, NATE HENDERSON, and JOSHUA SWARTZ, individuals, by and through their attorney, ANDREW T. SCHOPPE, hereby present and file their Complaint against Defendant CORRECTIONS CORPORATION OF AMERICA, as follows:

### I.  NATURE OF THE CLAIM

1. This suit is brought by the Plaintiffs, all of whom were employed in the State of Idaho as correctional officers by the Defendant, Corrections Corporation of America ("CCA"), a company that privately manages and operates prisons throughout the United States.

2. One of the prisons operated by CCA until June 30, 2014 was the Idaho Corrections Center located south of Boise, where the Plaintiffs all served as correctional officers.

3. Unfortunately, and likely for the sake of keeping its own profit margins as wide as possible, CCA operated the Idaho Corrections Center ("ICC") in a shockingly reckless manner that needlessly endangered and harmed all of the Plaintiffs and many of their coworkers, the inmates, and the tax-paying public itself for years.

4. CCA's recklessness manifested itself in several ways, all of which caused the already stressful and dangerous working environment inside ICC to become unreasonably, even crazily dangerous, and a virtually intolerable workplace for the Plaintiffs and for many of their fellow officers whose lives were continually at risk as they guarded the tiers and pods of the prison.

5. Rather than meet its legal, moral, and contractual duties to maintain a reasonably safe working environment at ICC, CCA intentionally failed to provide adequate staffing within the prison, and then defrauded the State of Idaho by preparing false staffing records, with "ghost workers" filling posts that were actually vacant. It also regularly and systematically failed to train its personnel adequately or according to the highest industry standards as it was obligated to do to ensure the safety of the facility.

6. CCA also routinely failed to ensure that its actual, non-fictional staff at ICC were properly equipped with standard safety equipment such as functioning radios, full oleoresin capsicum (pepper spray) canisters, or even handcuffs. CCA even exposed staff to the risk of infection with HIV or other serious diseases by failing to provide sharps containers for its staff to collect dirty needles and other tools used by inmates to ingest illegal drugs.

7. As a result of CCA's intentional and reckless misconduct, ICC became known as "Gladiator School," and was notorious for its abnormally-high levels of violence among the inmates.

8. As set forth below, and as the Plaintiffs will prove at trial, CCA's recklessness, negligence, and outright criminal conduct in operating ICC manifested in chronic chaos and excessive violent environment within the walls of the prison.

9. In spite of their own employer's refusal to do what was necessary to ensure their safety, the Plaintiffs and their coworkers continued to do their jobs and to fulfill their duties to protect the inmates, their fellow officers and coworkers, and the public.

10. As a direct, legal, and proximate result of the unreasonably dangerous and chaotic working environment that was unreasonably hazardous even for a prison, all of the Plaintiffs have

suffered extreme emotional distress as set forth in greater detail below.

11. Plaintiffs seek all available legal and equitable relief, in addition to monetary damages, attorney's fees, costs of suit, and interest thereupon, as well as all declaratory and injunctive relief which may be appropriate to remedy and prevent further misconduct of this sort by CCA.  Plaintiffs will seek leave to amend their pleadings to include a claim for punitive damages at an appropriate point in time.

### III.  JURISDICTION AND VENUE

12. The unlawful and wrongful conduct alleged in this Complaint occurred in the State of Idaho.

13. This Honorable Court has jurisdiction over this action under 28 U.S.C. §1332(a)(1) because, as set forth below, all of the Plaintiffs are citizens of different states from that in which the Defendant is domiciled.  Plaintiffs Eixenberger, Bravo, King, Vasquez, Swartz, Coombs, Danforth, and Henderson are all citizens and residents of the State of Idaho, and Plaintiff Taylor is a citizen and resident of the State of Michigan.

14. Defendant Corrections Corporation of America's headquarters and principal place of business is in Nashville, Tennessee.  On information and belief, CCA operated as a Maryland corporation from its initial formation in 1983 and until 2013, when it converted to a Maryland real estate investment trust ("REIT").  The amount in controversy exceeds $75,000, excluding interest and costs.

15. All of the Defendant's breaches of the written contract alleged in this Complaint— a contract which was made, in part, for the benefit of the Plaintiffs, who may thus bring suit

on it as third-party beneficiaries—were part of a pattern and practice of misconduct that occurred on a continuing basis between January 29, 2010- five years prior to the date of this filing— and June 30, 2014, when CCA's control of the Idaho Corrections Center came to an end following the State's decision to not renew its contract with CCA following the exposure of CCA's staffing fraud and related problems.

16. All of the Defendant's misconduct pertaining to the Plaintiffs' claims for negligence, intentional infliction of emotional distress, and/or other injuries and damages sounding in tort were part of a pattern and practice that occurred on a continuing basis between January 29, 2012—two years prior to the date of this filing— and June 30, 2014.  The Plaintiffs will present evidence at trial, though, that demonstrates that CCA's pattern and practice of dangerously reckless and/or deliberate misconduct also occurred on a continual basis prior to the applicable statutes of limitations.  The Plaintiffs' claims are thus timely-filed and are not barred by any statute of limitations set forth in Idaho Code § 5201, *et seq.*

## II.  PARTIES

17. According to its own 2013 Annual Report to its investors, Defendant Corrections Corporation of America is "the nation's largest owner of partnership correction and detention facilities and one of the largest prison operators in the United States, behind only the federal government and three states."  CCA currently incarcerates over 90,000 inmates in the 65 correctional facilities that it owns, controls, and/or manages in 20 states and the District of Columbia.  On information and belief, CCA's principal place of business and executive office is in Nashville, Tennessee.  On information and belief, CCA is domiciled

in the State of Maryland, and operated as a corporation until January 1, 2013, when it voluntarily converted to a publicly-traded real estate investment trust ("REIT"), a move which substantially reduced its tax liability. CCA operated the Idaho Correctional Center ("ICC") in Kuna, Idaho, under contract with the State of Idaho until June 30, 2014, and after the State declined to renew the contract in light of the staffing fraud alleged above.

18. Plaintiffs Mark Eixenberger, Mandi Bravo, Mario Vasquez, Leonard King, Steven Danforth, Morgan Coombs, Michelle Taylor, Nate Henderson, and Joshua Swartz are all former employees of CCA who worked as correctional officers at the Idaho Corrections Center in Kuna, Idaho within the time periods relevant to their claims in this action and, in some cases, right up until CCA relinquished its hold on the ICC prison facility on June 30, 2014.

19. Until June 30, 2014, CCA operated the Idaho Correctional Center ("ICC"), a prison facility located in Kuna, Idaho, pursuant to a written contract with the State of Idaho.

20. Plaintiffs do not know the true names or legal capacities of the defendants sued herein as DOES 1-20, inclusive, and therefore sue said defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the defendants designated herein as DOE defendants are legally responsible in some manner for the matters herein alleged, and are legally responsible in some manner for causing the injuries and damages to Plaintiffs hereinafter alleged.

21. Plaintiffs further allege that, under the doctrine of *respondeat superior*, the Defendant is liable for the unlawful conduct of its employees where those employees were acting within the course and scope of their employment, and that Defendant approved, ratified, and

COMPLAINT
6

authorized such misconduct, which resulted in damage and injury to the Plaintiffs.

## IV.  STATEMENT OF FACTS

22. "The CCA Way" paints a very rosy picture of how the Corrections Corporation of America's vision of being "the best full-service adult corrections system in the United Sates" is supposed to look.  "The CCA Way" is in writing, and is attached in Exhibit "A," and sets forth CCA's "Vision," its "Mission," and its "Guiding Principles."

23. Those "Guiding Principles" look genuinely inspiring on paper:

    "Integrity: Be honest and highly ethical.  Always do the right thing, with honorable intentions;"
    "Respect:  Treat each other and offenders as we want to be treated;"
    "Trust: Be competent and reliable.  Build positive relationships;"
    "Safety and Security: Dedicate every action to safe and secure correctional facilities.  Through training, skill and courage, protect our communities, individuals in our care and each other;"
    "Accountability: Hold ourselves responsible for every action.  Be good stewards of our customers' interests;"
    "Teamwork: Share, inspire and help one another daily.  Don't let others down, because together we make greater contributions."

24. It is unfortunately very clear, though, that those "Guiding Principles" were not followed by the company in operating the Idaho Corrections Center, apparently, in other CCA-run facilities throughout the nation.

25.

26. Between 2008 and 2014, CCA operated ICC under a contract formed with the State of Idaho pursuant to a request for proposals ("RFP") issued by the State.  A true and correct copy of that 872-page contract ("Contract") is attached hereto as Exhibit "B."

27. The Contract- which actually incorporated the terms of CCA's own proposal in response to

COMPLAINT
7

the RFP- required CCA to maintain a reasonably safe working environment at ICC by, among other things, employing qualified personnel who met the requirements set by the Idaho Board of Corrections; by training its personnel in a manner consistent with the standards of the industry and of the Board of Corrections; to ensure certain staffing ratios;

28. CCA promised to operate ICC "in accordance with both company- and facility-specific policies and procedures. The policies and procedures reflect the high standards generated by a number of sources, including the ACA, the Joint Commission on Accreditation of Healthcare Organizations, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government guidelines, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines."

29. In recognition of the fact that working in a prison environment is a high-stress environment, CCA promised to implement a "Crisis Intervention and Stress Management ("CJSM'')" system, which the Contract describes as "[a]n integrated system of interventions which recognizes that employee involvement in abnormally stressful emergency situations may cause adverse psychological reactions. Crisis intervention is emotional first aid and is not intended to replace any needed therapy or counseling. Use of a CISM Program generally decreases the percentage of employees who develop serious long-term psychological and/or physical problems and assists in preparing employees for their return to normal duties." Ex. B, CCA_K_060.

30. In accepting employment with CCA, the Plaintiffs were of course all aware that working at ICC would carry certain inherent risks and dangers, just like every prison everywhere.

COMPLAINT
8

31. The Plaintiffs relied on CCA's representations, including the ones above, to operate ICC in a reasonably safe manner and to do everything it could under the circumstances to ensure their health, safety, and sanity.

32. In spite of the lofty and inspiring promises it made in the Contract, CCA operated ICC in anything but a safe and secure manner, and callously placed its own profits ahead of the safety and security of its own employees, including the Plaintiffs, and the inmates which CCA was hired by the State of Idaho to simultaneously guard and protect.

33. Rather than meet its obligations under the Contract, CCA failed in its legal, moral, and contractual duties toward the Plaintiffs and their coworkers in regularly and systematically violating basic safety standards, including the terms of the Contract which were intended to ensure the safety of its own staff. As a result, ICC became more violent than all of the other prisons in Idaho put together, and placed the safety of the Plaintiffs, their coworkers, the inmates, and the public in needless and extreme danger.

34. Most infamously, CCA chronically and deliberately understaffed the prison, and actually admitted to falsifying approximately 4,800 hours of staffing records to indicate that critical security posts were staffed when in fact they were vacant.  This posed an obvious and very serious problem for the security of the facility because it heightened the risks already inherent in a prison environment even while it diminished the ability of the non-fictional correctional officers who were actually present to respond to violent, and sometimes deadly, incidents by and between inmates and gangs, or— worse— between inmates and the officers, including the Plaintiffs, themselves.

35. Even after its "ghost worker" deceit was discovered, CCA did not actually take any

meaningful steps to correct the problem with understaffing, but merely began to accurately record the fact that it was failing to ensure that adequate numbers of security officers were guarding the inmates and protecting their fellow security officers. According to IDOC records, CCA left more than five hundred mandatory security posts vacant during one period of time in 2010, and left three hundred such posts vacant in 2011.

36. As a result of understaffing and other problems, ICC had roughly three times the number of inmate-on-inmate assaults as other state prisons. This kind of understaffing also led to the improper use of "overtimers," who were permitted by CCA to work to the point that they were too fatigued to be of any meaningful use in protecting their fellow security officers or in guarding inmates. Other security officers, including the Plaintiffs, were left to do risky, but necessary jobs—pill calls, watch tours, mail distribution, or conduct contraband inspections, to cite a few examples—on their own, and without adequate Emergency Response Team or "tier support" in the event of an assault or other dangerous incident.

37. In spite of all of this, the Plaintiffs and their coworkers were expected and required by CCA to maintain order and safety in the tiers and pods in which inmates were housed. When they were unable to do so because of their own employer's unwillingness to supply them with the personnel or equipment needed to accomplish that task, it became common practice within the prison to essentially commit the responsibility for the safety of particular tiers or pods to the very gangs that lived in them. Of course, this only further eroded the perceived authority of the correctional officers and of the prison as a whole and heightened the levels of stress and tension for the Plaintiffs and their fellow officers.

38. Even worse, the Plaintiffs and other employees were forced to do such jobs, and to patrol

the tiers while in the midst of dozens of inmates at a time, with basic safety equipment that CCA knew to be defective. For example, the Plaintiffs and their fellow employees were forced to patrol the prison for months with radios whose call buttons were not functional and that were nothing more than spring-loaded "placebo" buttons that would issue no signal for help when pressed, leaving them without a means to call for assistance in the all-too-likely event of an assault by inmates. Many of the radios were also rendered useless by "broken channels," where radios frequently and unpredictably switched channels. Even though employees routinely posted complaints about the "broken" channels, CCA denied that there was any problem, and permitted even critical security positions, such as the "crash gate" at which employees are in constant contact with prisoners must frequently pat them down, were left without a reliable means of communication in the event of an assault or other problem.

39. If the lack of basic communications equipment were not enough, CCA failed to ensure that employees have enough oleoresin capsicum canisters—"pepper spray," in common parlance—even for employees in crucial "utility" positions. Handcuffs that can be used to restrain prisoners at critical times were also often in short supply, and employees considered themselves lucky to get a pair if they arrived for their shifts early enough. In contrast, all security staff at IDOC facilities were routinely issued handcuffs. Further, mobile corrections officers were supposedly required to have both lethal and non-lethal means of force available to them when driving vehicles for purposes of stopping escape attempts. However, ICC vehicles were equipped with only lethal weapons and the unreliable radios noted above, and mobile officers had no pepper spray, body armor, or other non-lethal options for the use of force in extremely dangerous situations. In other basic security lapses, decorative river rocks

surrounded the facility even though they could easily have been used as weapons by inmates during such escapes or at other times when they can get their hands on them.

40. The chronic understaffing situation that CCA created at ICC left the Plaintiffs and their coworkers exposed to unreasonable and often terrifying levels of danger inside the prison. CCA also failed to ensure that its employees are properly trained in appropriate law enforcement procedures, thus exposing them, their coworkers, and inmates to unreasonable risks of harm. New hires were trained in impractical, barely-adequate combat methods that were typically ineffective in actual hand-to-hand combat situations. After providing an anemic forty hours of training as a means of introducing them to the extremely dangerous corrections environment, new employees were sent out to deal directly with violent criminals and other inmates.

41. The lack of training endangered both new and old employees, including the Plaintiffs, and the inmates themselves, and in 2013 even manifested in a riot in which an inexperienced officer operating the pod control unit became confused and inadvertently released inmates from rival gangs who were imprisoned in ICC's A-Pod segregation unit. A riot ensued in which many were injured. CCA administrators had been warned about the strong likelihood of such a mistake occurring due to the lack of appropriate fail-safe measures which could have prevented the problem.

42. For example, in early 2014, a gang fight occurred in the JKL unit—one of the most violent units in the facility—after the assistant warden ordered a reduction in staffing in the unit in order to cover another post left vacant due to understaffing.

43. In that instance, immediately after an officer left the tier unmonitored in order to conduct a

required pill call, a gang fight broke out in which the officer, who returned to break up the fight, was injured.  A severely injured inmate was also transported by helicopter to the hospital.  The injured officer was later disciplined for the situation, even though the fault for understaffing the unit, and thus leaving the officer with no choice but to leave the unit unmonitored, belonged to the administration.

44. The Plaintiffs and other employees reported these problems to CCA administrators, who have routinely failed to take meaningful action to ensure the safety of employees and inmates, and who have instead frequently shifted blame to employees.  CCA's grievance process was a sham, and formal grievances were discouraged and even subjected the reporters to retaliation:  promotions denied, difficult shift changes, unfair disciplinary actions, and other adverse actions—in response to their honest reporting of major problems at the prison.

45. For example, in early 2014, Plaintiff Eixenberger was issued a "Problem Solving Notice" which he challenged.  Even after presenting proof that the issuing administrator had made false allegations against Eixenberger, and after requesting that the false charges be removed from his employee file, CCA administrators did nothing.  In other situations, when the Plaintiffs or their fellow employees raised concerns about the dangerously low staffing situation, those concerns were met with inaction and even mockery.

46. CCA is a company that touts itself as the preeminent private prison operator in the United States, and yet it recklessly failed to take even the most basic measures to ensure the safety of the Plaintiffs and its other employees at ICC, as well as the inmates themselves, to the point that it may be safely inferred that it places no significant value upon human life.

47. The Plaintiffs are far from the only ones who have accused CCA of this serious misconduct,

as evidenced by a long string of lawsuits and law enforcement investigations into the same safety and security violations alleged by the Plaintiffs in this action.

48. In 2010, a $155 million dollar lawsuit was filed by the ACLU against the Idaho Department of Corrections and CCA.  In that lawsuit— TK name— the ACLU alleged that CCA's operation of ICC had resulted in abnormally high rates of violence among the inmates, and that inmates were systematically denied constitutionally-adequate medical treatment.

49. In 2011, a group of inmates at ICC filed the lawsuit styled *Kelly v. Wengler*, Case No. 1:11-CV-185-S-EJL, in the United States District Court for the State of Idaho.

50. In that lawsuit, the inmates alleged that ICC had become so violent under CCA's watch that it had become known as "Gladiator School," With more violent assaults within its walls than in all of the other prisons in Idaho combined.  That lawsuit was ultimately settled, and CCA agreed to ensure that posts within ICC were staffed as required by the Contract with the State of Idaho.  See Exhibit "C," consisting of a true and correct copy of the Settlement Agreement, Dkt. No. 25 in the *Kelly* case, which is incorporated herein by reference.

51. According to a lawsuit filed in 2013 by former ICC Chief of Security Shane Jepsen— a supervisor under whom all of the Plaintiffs worked at one time or another, and who claimed to have been scapegoated by CCA when he was dismissed — he had personally reported to the former Warden, Timothy Wengler, to assistant wardens, and to CCA itself, via an electronic reporting system, numerous instances in which safety and security protocols designed to ensure the safety of the inmates and staff were violated, disregarded, or never implemented at all by CCA, including the staffing fraud to which CCA eventually admitted in or around April of 2013.

52. According to Jepsen, his reports were ignored, and neither the Warden nor anyone senior to him at CCA made any effort to address the problems.

53. IDOC became aware of the staffing fraud at some point in late 2010, and began to investigate the issue along with the Idaho State Police, which eventually terminated its investigation after the FBI began its own in 2013.  Oddly, the State of Idaho settled its claims against CCA in 2014 for the sum of $1 million, even though none of the law enforcement investigations had yet been completed.  The FBI investigation is ongoing as of the date of this Complaint.

54. Since CCA relinquished its hold on the ICC facility on June 30, 2014, it has been operated by IDOC, and the Plaintiffs who have continued to work there since that time have been greatly relieved that the safety and security situation in the prison has significantly improved.

55. This came at no small cost to IDOC, however, which has had to invest substantial amounts into purchasing proper safety and security equipment— including the functioning radios, pepper spray devices, and handcuffs with which CCA failed to supply the Plaintiffs and their coworkers, as well as with Kevlar protective gear, less-than-lethal weapons for use in prison riots and other dangerous situations—  in training and re-training former CCA employees who were un- or undertrained under IDOC standards, and in making much-needed changes to basic security protocols throughout the facility.

56. All of the Plaintiffs have been subjected to unreasonably dangerous risks and lethal hazards at ICC as a direct, proximate, and legal result of CCA's negligence and gross recklessness in operating the ICC prison facility.

57. With the exception of Leonard King, who in 2012 experienced a serious assault as a result of the reckless indifference of CCA supervisors to a threat of deadly violence made by a

prisoner, and who was also stuck by an improperly-disposed drug needle which fortunately turned out to not be contaminated with HIV, the other Plaintiffs were fortunate enough to have escaped serious physical injury for the most part, but the needlessly extreme and intense day-to-day stress of working in such an unreasonably unsafe environment took a severe and lasting emotional and psychological toll on all of them.

58. All of Plaintiffs saw their personal lives and relationships suffer as a result of the unreasonably severe strains placed upon them by CCA's reckless operation of the ICC facility— for example, Eixenberger and Vasquez both attribute their failed marriages to those strains—and all of them have sought medical treatment and/or counseling in order to help them cope with the extreme levels of stress caused by the unreasonably unsafe environment which CCA knowingly permitted to exist at ICC for years.  Eixenberger has been treated for symptoms related to post-traumatic stress disorder, and Vasquez has been treated for an anxiety disorder that he attributes to his unreasonably stressful and dangerous work environment.  As a direct, legal, and proximate result of CCA's recklessness in operating the prison, all of the Plaintiffs— who started out as the kind of tough, resilient people who were brave enough to work in a prison in the first place— have suffered, in one combination or another, extreme levels of anxiety, depression, insomnia, and intense fear of imminent violence by the inmates over whom ICC exerted so little control during CCA's control of the facility.

59. Based upon the foregoing facts, all of which will be supported by evidence to be produced and/or discovered in the course of discovery and other investigation into their claims, the Plaintiffs seek relief on the following causes of action.

## COUNT ONE,

## FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

60. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

61. Like all workers throughout the country, CCA had a duty to the Plaintiffs to furnish them and their coworkers with "employment and a place of employment which are free of from recognized hazards that are causing or are likely to cause death or serious physical harm." 29 USC § 654(a)(1).  This is commonly known as the "general duty clause" applied by the Occupational Health and Safety Administration, and is a safety standard to which CCA claims to subscribe in its own Code of Conduct:

62. "The health and safety of all employees is a primary concern of the company. The following statement describes the guidelines necessary to achieve the company's goal of protecting its employees from recognized hazards in the workplace.….The company and its employees must comply with all federal, state and local health and safety laws and regulations, including the rules and regulations of the Occupational Safety and Health Administration (OSHA).   The company and its employees share responsibility for maintaining a safe work environment.   The company encourages employees' involvement with the company's health and safety programs to ensure the safety and health of the work environment and to minimize workplace hazards. All employees are encouraged to make suggestions to their supervisor concerning how to improve workplace safety. The company also requires employees to fully comply with the company's safety and health programs and all relevant OSHA standards."As alleged above, CCA plainly failed to take the safety

and security of the Plaintiffs seriously at all, much less to have made this the central focus of its operations, and in doing so with such recklessness, it subjected all of the Plaintiffs to severe emotional distress. Under the laws of the State of Idaho, four elements are necessary to establish a claim of intentional infliction of emotional distress: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. All of those elements are plainly met here.

63. The severe emotional distress and other injuries and damages suffered by the Plaintiffs were entirely foreseeable, and even probable, in the context of a correctional facility. In fact, severe stress and emotional distress among corrections officers is rampant and very well documented. The United States Department of Justice, other law enforcement agencies, academic institutions, and groups formed for the benefit of correctional officers and other prison workers have conducted numerous studies concerning the negative effects of increased stress and prison-related trauma on correctional officers like the Plaintiffs.

64. As the nationally preeminent operator of private prisons in the United States, CCA knew, or should have known, that its own misconduct— in understaffing ICC; in failing to properly train its employees; in failing to supply the Plaintiffs and other employees with proper safety and security equipment; in failing to even supply basic "sharps" containers for the protection of employees like King from the risk of inadvertent and deadly infection by HIV and other diseases; and in failing to perform its most basic responsibilities competently— would only aggravate the stressors and hazardous working conditions to which the Plaintiffs were already subject as correctional officers.

COMPLAINT
18

65. The Plaintiffs' injuries were thus the direct, legal, and proximate result of the knowing, reckless, intentional, extreme, and outrageous misconduct and negligence of the Defendant and its employees, agents, and/or representatives in negligently creating and maintaining an unreasonably dangerous workplace.  On information and belief, CCA ratified the wrongful conduct of its employees, including the Warden, Assistant Wardens, and other supervisors who ignored and/or oppressed the Plaintiffs and others in response to their reports of serious safety problems at ICC, and CCA therefore can and must be held liable for their conduct

66. Unfortunately for all of the Plaintiffs, the day-to-day experience of working under the dangerous conditions so reckless caused by CCA's misconduct actually did result in severe and lasting emotional distress outlined above.

67. Under the laws of the State of Idaho, the Plaintiffs are entitled to recover monetary damages from the Defendant in an amount which will reasonably compensate them for their injuries.

68. Plaintiffs will seek damages in an amount which is far in excess of this Honorable Court's minimum jurisdictional limit of $75,000, and in an amount to be proven at trial.

69. The Plaintiffs have also been compelled to retain the services of attorney Andrew T. Schoppe to bring and prosecute this claim, and are entitled to reasonable attorney fees for the services of their attorney under Idaho Code §§ 12-120 and 12-121.

70. Plaintiffs will seek leave of this Honorable Court to amend their pleadings to include a claim for punitive damages pursuant to Idaho Code § 6-1604 at the appropriate time.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, and each of them, pray for judgment against Defendant Corrections Corporation of America as follows:

1. For a money judgment in a sum to be proven at trial, but for not less than $1,000,000 each, against the Defendant, and in favor of the Plaintiffs, for the Plaintiffs' past, present, and future medical costs and expenses, for their pain and suffering, and for the emotional distress they suffered as a direct, legal, and proximate result of the Defendant's unlawful, outrageous, negligent, and intentional misconduct; and,

2. For an award of reasonable attorney fees in an amount to be determined by the Court, and for the Plaintiffs' costs of suit; and,

3. For such other and further relief in law or equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby respectfully demand that this matter be tried by jury as allowed by Idaho law.

Respectfully submitted,

Date:   January 30, 2015

THE LAW OFFICE OF
ANDREW T. SCHOPPE, PLLC

BY: *[signature]*

ANDREW T. SCHOPPE
Attorney for Plaintiffs,
MARK EIXENBERGER, MANDI BRAVO, MARIO VASQUEZ, LEONARD KING, STEVEN DANFORTH, MORGAN COOMBS, MICHELLE TAYLOR, NATE HENDERSON, and JOSHUA SWARTZ

COMPLAINT
20