UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| MARK EIXENBERGER, an individual; MANDI BRAVO, an individual; MARIO VASQUEZ, an individual; LEONARD KING, an individual; STEVEN DANFORTH, an individual; MORGAN COOMBS, an individual; MICHELLE TAYLOR, an individual; NATE HENDERSON, an individual; JOSHUA SWARTZ, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>CORRECTIONS CORPORATION OF AMERICA, a Maryland Real Estate Investment Trust,<br><br>Defendant. | Case No.: 1:15-cv-00027-EJL-REB<br><br>**REPORT AND RECOMMENDATION RE: DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**<br><br>**(Docket No. 18)** |

Now pending before the Court is Defendant's Motion to Dismiss (Docket No. 18). Having carefully considered the record, participated in oral argument,[1] and otherwise being fully advised, the undersigned enters the following Report and Recommendation:

## I. BACKGROUND

Plaintiffs were each employed as correctional officers by Defendant Corrections Corporation of America ("CCA"), a company that privately manages and operates prisons throughout the United States, including (until June 30, 2014) the Idaho Corrections Center ("ICC") in Boise, Idaho. According to Plaintiffs, CCA operated ICC "in a shockingly reckless

---

[1] The Court heard Defendants' Motion to Dismiss on July 21, 2016. Though Plaintiffs' counsel did not appear, Defendants' counsel presented oral argument and entertained the undersigned's questions pertinent to the Motion's merits.

**REPORT AND RECOMMENDATION - 1**

manner that needlessly endangered and harmed all of the Plaintiffs and many of their coworkers, the inmates, and the tax-paying public itself for years." Am. Compl., ¶ 3 (Docket No. 17). Specifically, Plaintiffs allege that, in violation of its moral, legal, and contractual duties to maintain a reasonably safe working environment at ICC, CCA (1) intentionally failed to provide adequate staffing within ICC; (2) prepared false staffing records (with "ghost workers" filling posts that were actually vacant); (3) failed to train its personnel adequately or according to industry standards; (4) failed to ensure that its personnel were properly equipped with standard safety equipment; and (5) exposed staff to life-threatening diseases by failing to provide "sharps" containers to collect dirty needles and other devices used by inmates to consume illegal drugs. *See id*. at ¶¶ 5-6. In turn, Plaintiffs assert two causes of action against CCA: intentional infliction of emotional distress("IIED") (Count One), and breach of contract – third-party beneficiary (Count Two). *See id*. at ¶¶ 10-11, 66-93.

CCA now moves to dismiss Plaintiffs' Amended Complaint for failure to state a claim upon which relief may be granted. *See* MTD, pp. 1-2 (citing Fed. R. Civ. P. 12(b)(6)). In particular, as to Plaintiffs' IIED claim, CCA primarily argues that the allegations do not rise to the requisite level of intentional or reckless conduct that is extreme and outrageous under Idaho law. *See id*. at p. 2; *see also* Mem. in Supp. of MTD, pp. 7-12 (Docket No. 18, Att. 1).[2] And, as to Plaintiffs' breach of contract claim, CCA primarily argues that Plaintiffs have not sufficiently

---

[2] CCA additionally argues that (1) some of Plaintiffs' claims are barred by workers' compensation law; (2) Plaintiffs' claims are untimely; (3) Idaho law does not support an IIED claim against an employer in this context; and (4) Plaintiffs' IIED claim was already dismissed in state court. *See* MTD, p. 2 (Docket No. 18); *see also* Mem. in Supp. of MTD, pp. 6-7, 12-13 (Docket No. 18, Att. 1). These alternate arguments, while potentially intertwined with the CCA's more focused arguments, are superfluous in light of the undersigned's examination of CCA's alleged conduct against the standards imposed by Idaho law and, therefore, not addressed in depth within this Report and Recommendation.

**REPORT AND RECOMMENDATION - 2**

pled any facts showing that they were the intended third-party beneficiaries to the at-issue contract between CCA and the Idaho Department of Corrections ("IDOC"). *See* MTD, p. 2 (Docket No. 18); *see also* Mem. in Supp. of MTD, pp. 13-17 (Docket No. 18, Att. 1).[3]

## II. REPORT

### A. Motion to Dismiss Standard

FRCP 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a complaint attacked by an FRCP 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*.

When reviewing a complaint under this Rule, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *See Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). "Factual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell*, 550 U.S. 544 at 555. In other words, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[3] CCA additionally argues that (1) the statute that governs the contract does not provide a private cause of action; and (2) Plaintiffs cannot recover for emotional distress on a breach of contract theory under Idaho law. *See* MTD, pp. 2-3 (Docket No. 18); *see also* Mem. in Supp. of MTD, pp. 17-18 (Docket No. 18, Att. 1). Again, these alternate arguments, while potentially intertwined with the CCA's more focused arguments, are superfluous in light of the undersigned's consideration of whether Plaintiffs were intended third-party beneficiaries to the contract and, therefore, not addressed in depth within this Report and Recommendation.

**REPORT AND RECOMMENDATION - 3**

reasonable inference that the defendant is liable for the misconduct alleged. *See id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *See id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009). The Ninth Circuit has held that "in dismissal for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). The issue is not whether the plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *Hydick v. Hunter*, 466 F.3d 676, 685 (9th Cir. 2006).

**B.      Plaintiffs Have Not Stated a Claim Upon Which Relief Can Be Granted**

   1.     Plaintiffs' IIED Claim (Count 1)

In Idaho, "an action for [IIED] will lie only where there is extreme and outrageous conduct coupled with severe emotional distress." *Walston v. Monumental Life Ins. Co.*, 923 P.2d 456, 464 (Idaho 1996) (citation omitted). To prevail on this cause of action, a plaintiff must show: (1) that the defendant acted intentionally or recklessly; (2) that the defendant's conduct was extreme and outrageous; (3) that there was a causal connection between the defendant's conduct and the plaintiff's emotional distress; and (4) that the plaintiff's emotional distress was severe. *Id.*

**REPORT AND RECOMMENDATION - 4**

To qualify as "extreme and outrageous," the defendant's conduct must be more than merely unjustifiable, objectionable, or unreasonable; it must be "'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" *Edmondson v. Shearer Lumber Prod.*, 75 P.3d 733, 741 (Idaho 2003); *see also Mortensen v. Stewart Title Guar. Co.*, 235 P.3d 387, 397 (Idaho 2010) ("To be actionable, the conduct must be so extreme as to arouse an average member of the community to resentment against the defendant, and must be more than unreasonable, unkind, or unfair.") (citations and internal quotation marks omitted); *Estate of Becker v. Callahan*, 96 P.3d 623, 628 (Idaho 2004) ("Courts have required very extreme conduct before awarding damages for the intentional infliction of emotional distress."). Whether a defendant's conduct is so extreme and outrageous as to permit recovery is a matter of law. *See Edmondson*, 75 P.3d at 741 ("It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery."); *see also McKinley v. Guaranty Nat. Ins. Co.*, 159 P.3d 884, 891 (Idaho 2007) ("The district court acts as a gatekeeper for IIED claims, weeding out weak causes of action.").

Here, Plaintiffs' allegations acknowledge that life as a correctional officer is inherently dangerous and stressful. *See, e.g.*, Am. Compl., ¶¶ 35 & 70 (Docket No. 17) ("In accepting employment with CCA, the Plaintiffs were of course all aware that working at ICC would carry certain inherent risks and dangers, just like every prison everywhere. . . . . [S]evere stress and emotional distress among corrections officers is rampant and very well documented. The United States Department of Justice, other law enforcement agencies, academic institutions, and groups formed for the benefit of correctional officers and other prison workers have conducted

**REPORT AND RECOMMENDATION - 5**

numerous studies confirming the negative effects of increased stress and prison-related trauma on correctional officers like Plaintiffs."). But Plaintiffs' IIED claim goes further in alleging that CCA did not take appropriate safety precautions to sufficiently protect them from inmates. For example, Plaintiffs allege that CCA failed to provide adequate staffing and training, in addition to necessary safety equipment (e.g., functioning radios, full pepper spray canisters, handcuffs, and "sharps" containers to dispose dirty needles). *See id*. at ¶¶ 5-6, 40-47, 71. Plaintiffs characterize CCA's conduct in these respects as "negligence" and "gross negligence," claiming that CCA's "reckless operation" of the ICC facility "took a severe and lasting emotional and psychological toll on all of them." *Id*. at ¶¶ 62-64; *see also id*. at ¶ 72. In essence, Plaintiffs contend that CCA didn't do enough to protect them from potential harm – that a correctional officer's already-stressful job at ICC was magnified by CCA's "fail[ure] to perform its most basic responsibilities competently." *Id*. at ¶ 71. These allegations are no-doubt serious; they do not, however, provide the basis for an IIED claim here.

The complained-of conduct – although unjustifiable if true – is not atrocious and beyond all possible bounds of decency. As Chief U.S. District Judge B. Lynn Winmill explained in a recent case:

> Examples of conduct that have been deemed sufficiently extreme and outrageous by Idaho courts include: an insurance company speciously denying a grieving widower's cancer insurance claim while simultaneously impugning his character and drawing him into a prolonged dispute; prolonged sexual, mental, and physical abuse inflicted upon a woman by her co-habitating boyfriend; recklessly shooting and killing someone else's donkey that was both a pet and a pack animal; and real estate developers swindling a family out of property that was the subject of their lifelong dream to build a Christian retreat.

*Timothy v. Oneida County*, 2015 WL 2036825, *12 (D. Idaho 2015) (citing *Walston*, 923 P.2d at 464-65; *Curtis v. Firth*, 850 P.2d 749, 756-57 (Idaho 1993); *Gill v. Brown*, 695 P.2d 1276, 1277-

**REPORT AND RECOMMENDATION - 6**

78 (Idaho Ct. App. 1985); *Spence v. Howell*, 890 P.2d 714, 724-25 (Idaho 1995)).[4]  Importantly, such instances of severe and outrageous conduct involve behavior directed at a particular individual.  *See, e.g.*, *Alderson*, 132 P.3d at 1268-69 ("Although Kelli was living in JoDee Alderson's residence during part of the period when Bonner was videotaping there, she was not a target or focus of his spying. . . . .  Accordingly, we hold that Kelli did not meet her burden to prove that Bonner's conduct *toward her* rose to the level of outrageousness or atrociousness that is necessary to support a cause of action for intentional infliction of emotional distress.") (emphasis in original).

By comparison, in the setting supplied by the allegations within their Amended Complaint, Plaintiffs highlight institutional management issues at ICC involving CCA's across-the-board actions and/or inactions.  While indeed concerning, the matters described by Plaintiffs raise generalized grievances of perceived workplace shortcomings, not behavior directed at any particular target.  To be sure, Idaho courts have never held that employment-related administrative decisions that contribute to a potentially-dangerous workplace (like, as Plaintiffs allege here, understaffing, inadequate training, and insufficient protective equipment) amount to the sort of extreme or outrageous conduct that will support an IIED claim.[5]  Without such a

---

[4] In contrast, in some cases where conduct was arguably unjustifiable, it was nevertheless held not to be sufficiently outrageous or extreme for liability.  *See Alderson v. Bonner*, 132 P.3d 1261 (Idaho Ct. App. 2006) (citing *Brown v. Matthews Mortuary, Inc.*, 801 P.2d 37 (Idaho 1990) (loss of corpse was not extreme or outrageous); *Hatfield v. Max Rouse & Sons Northwest*, 606 P.2d 944, 954-55 (Idaho 1980) (auctioneer's sale of equipment at "ruinous" price below minimum set by seller, and issuance of multi-payee settlement check that caused intra-family conflict); *Payne v. Wallace*, 32 P.3d 695 (Idaho Ct. App. 2001) (belligerent yelling of profanities in presence of a child after an automobile accident)).

[5] This is not to say that conduct amounting to harassment or discrimination in an employment setting cannot be extreme and outrageous enough to form the basis for an IIED claim.  Plaintiffs make no such allegations and, thus, this Report and Recommendation does not speak to that issue.

**REPORT AND RECOMMENDATION - 7**

targeted focus, it cannot be said that CCA's alleged actions in these respects are sufficiently extreme and outrageous to support Plaintiffs' IIED claim. Plaintiffs' IIED claim should be dismissed.

  2. <u>Plaintiffs' Breach of Contract – Third-Party Beneficiary Claim (Count Two)</u>

Plaintiffs assert a breach of contract claim based upon alleged violations of a contract between CCA and IDOC – that contract generally discusses ICC's manner of operations, including safety standards. *See* Am. Compl., ¶¶ 5, 11, 17-18, 21, 27-33, 75-77 (Docket No. 17). Plaintiffs claim that they are intended third-party beneficiaries to that contract, entitling them to enforce its terms and seek damages for alleged violations thereof. *See id*. at ¶¶ 74-77, 83, 89.

"When a contract is made expressly for the benefit of a third person, the contract may be enforced by the third person at any time before the parties to the contract rescind it." *See Partout v. Harper*, 183 P.3d 771, 775 (Idaho 2008). Idaho law requires, as an element of a third-party beneficiary claim, identification of a written contract and the terms showing the contracting parties' intent to directly benefit the third party. *See id*. (internal citations omitted). "The third party must show the contract was made primarily for his benefit; it is not sufficient that the third party is a mere incidental beneficiary to the contract." *Id*. (internal citations omitted). In these respects, "[t]he intent to benefit the third party must be expressed in the contract itself." *Id*. (internal citations omitted).

Here, the contract in question specifically disallows third-party beneficiaries – at least as of February 26, 2011. Subsection 6.18 of the contract reads:

> **Contract subsection 6.18 No Third Party Beneficiary**
> There is a new Contract subsection 6.18 hereby added to the Contract that reads as follows: "This Contract shall benefit and burden the parties hereto in accordance with its terms and conditions *and is not intended, and shall not be deemed or*

**REPORT AND RECOMMENDATION - 8**

> *construed, to confer any rights, powers, benefits, or privileges on any person or entity other than the parties to this contract.* This Contract is not intended to create any rights, benefits, liberty interests, or entitlements in favor of any Offender. *The Contract is intended only to set forth the contractual rights and responsibilities of the Contract parties.*

Contract, p. 6, attached as Appx. D to MTD (Docket No. 18, Att. 5) (emphasis added).[6] In other words, from February 26, 2011 onward, the contract expressly disclaims any intent to benefit a third party, including Plaintiffs. Accordingly, Plaintiffs' breach of contract – third-party beneficiary claim during this time cannot stand.

But what about *before* February 26, 2011 or, more accurately, the time period in between January 30, 2010[7] and February 26, 2011? During this discrete one-year period, did the contract exist primarily for Plaintiffs' benefit? CCA says no, arguing that Plaintiffs "have not identified any part of the pre-amendment contract that shows that the contract was made 'expressly for the benefit of' Plaintiffs as third-party beneficiaries." Mem. in Supp. of MTD, p. 16 (Docket No. 18, Att. 1) (quoting I.C. § 209-102) (emphasis in original). The undersigned agrees.

While Plaintiffs might be incidental beneficiaries to the contract during this time (or, even, after February 26, 2011), nowhere in their Amended Complaint (or briefing in response to

---

[6] Plaintiffs claim that the February 26, 2011 amendment was never produced prior to CCA filing its Motion to Dismiss. *See* Opp. to MTD, p. 12 (Docket No. 23). At oral argument, CCA's counsel seemed to confirm as much, admitting that the parties had not exchanged Initial Disclosures under Rule 26 of the Federal Rules of Civil Procedure, which, presumably, would have included the amendment. Whether the parties were *required* to conduct such an exchange in this particular case is not the subject of this Report and Recommendation; regardless, there is no reason to believe the parties' arguments in these respects (had such an exchange taken place) would be any different from those already presented.

[7] Plaintiffs initiated this action on January 30, 2015. *See* Compl. (Docket No. 1). Under Idaho law, the statute of limitations for contract claims is five years. *See* I.C. § 5-216. Therefore, Plaintiffs' breach of contract – third-party beneficiary claim must be premised upon conduct *after* January 30, 2010 (but, still, before the February 26, 2011 amendment).

**REPORT AND RECOMMENDATION - 9**

CCA's Motion to Dismiss) do Plaintiffs identify any evidence that "expressly" shows that CCA and IDOC entered into the contract "primarily" for their individual benefit – beyond, simply, alleging that to be the case. They cannot meet the requirement of Idaho case law that the party claiming to be a third-party beneficiary must show that the contract expressly indicates that it was made for their direct benefit. Here, the contract does not clearly demonstrate an intent expressly to benefit any party besides IDOC and CCA, including Plaintiffs. Plaintiffs' breach of contract – third-party beneficiary claim should be dismissed.

C.     **Leave to Amend is Inappropriate**

Even though a dismissal for failure to state a claim is typically accompanied by leave to amend, the addition of more detailed allegations would not change the fact that Plaintiffs are pursuing claims that are not legally cognizable. In other words, no amendment could save Plaintiffs' Amended Complaint. This is particularly the case when also considering that Plaintiffs' Amended Complaint here represents their fourth attempt at asserting similar claims – twice in state court and, now, twice here. Plaintiffs should not be granted leave to amend.

## III.  RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED THAT Defendant's Motion to Dismiss (Docket No. 18) be GRANTED.[8]

Pursuant to Local Civil Rule 72.1(b)(2), a party objecting to a Magistrate Judge's recommended disposition "must serve and file specific, written objections, not to exceed twenty pages . . . within fourteen (14) days. . ., unless the magistrate or district judge sets a different

---

[8] As a housekeeping matter, it is additionally recommended that Defendant's original Motion to Dismiss (Docket No. 16) (filed before Plaintiffs amended their Complaint) be denied as moot.

**REPORT AND RECOMMENDATION - 10**

time period." Additionally, the other party "may serve and file a response, not to exceed ten pages, to another party's objections within fourteen (14) days after being served with a copy thereof."



DATED: **August 15, 2016**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**REPORT AND RECOMMENDATION - 11**